560 So.2d 868 (1990)
ERICH STERNBERG REALTY COMPANY, INC.
v.
LOUISIANA TAX COMMISSION (Four Cases).
Nos. CA 88 1679 to CA 88 1682.
Court of Appeal of Louisiana, First Circuit.
April 10, 1990.
Rehearing Denied June 4, 1990.
*870 Larry M. Roedel, Baton Rouge, for plaintiff-appellee Erich Sternberg Realty Co., Inc.
Robert H. Abbott, III, Baton Rouge, for defendant-appellant Louisiana Tax Com'n.
William J. Friedman, Jr., Lafayette, for defendant-appellee City of Lafayette.
Before EDWARDS, LANIER and CRAIN, JJ.
LANIER, Judge.
These are four consolidated actions in which a taxpayer challenges the correctness of assessments of some of its property for the years 1982,[1] 1983 and 1985. The Louisiana Tax Commission (Commission) reviewed the assessments, and affirmed the assessed evaluation for the land and reduced the assessed evaluation for the building (improvements) on the land. The taxpayer appealed to the district court. The district court rendered judgment in favor of the taxpayer and ordered that: (1) the land be reassessed pursuant to criteria set forth in the reasons for judgment, and (2) the sheriff refund the taxes paid under protest. The Commission took this suspensive appeal.

*871 FACTS
On December 7, 1977, Erich Sternberg Realty Co., Inc. (Sternberg) purchased a 10.569 acre tract of land in the City of Lafayette, Lafayette Parish, Louisiana. The purchase price of this property was $15,000 per acre ($0.34 per square foot) for a total sale price of $158,535. Sternberg also acquired options to buy two additional tracts of 2.015 and 2.952 acres for $15,000 per acre. The 10.569 acre tract became part of the Acadiana Mall. Sternberg constructed a building on this property which had 121,162 square feet of floor space, of which 77,700 square feet was selling area and 43,462 square feet was storage area. The cost of this building was $4,142,318, or $34.19 per square foot of floor space ($4,142,318 divided by 121,162). The building covered 2.540 acres of the site, and the remaining 8.029 acres of the tract was paved and used for parking. The building and land were leased to Goudchaux's.
The property tax provisions of the Louisiana Constitution of 1974 became effective for the 1978 tax year. La. Const. of 1974, art. VII, §§ 18 and 20; art. XIV, §§ 13 and 35. The Commission ordered a reappraisal of all taxable property in Louisiana for the four year tax period of 1978, 1979, 1980 and 1981. The valuation (lien) date for this reappraisal was fixed as October 1, 1976. The record before us does not reflect when Sternberg's land and building first went on the tax rolls of Lafayette Parish, nor does it reflect the appraisal or assessed values of these properties at that time.
In 1981, pursuant to the requirements of La. Const. of 1974, art. VII, § 18(F), the assessor of Lafayette Parish reappraised all property subject to ad valorem taxes. This reappraisal served as the basis for ad valorem taxes for 1982, 1983, 1984 and 1985. The valuation (lien) date for this reappraisal was January 1, 1981. The assessor determined the fair market value of the Sternberg land was $7.00 per square foot ($304,920 per acre), for a total value of $3,219,950 (10.56 acres times 43,560 square feet in an acre times $7.00 per square foot). Pursuant to La.Const. of 1974, art. VII, § 18(A) and (B), the Sternberg land was listed on the assessment rolls at 10% of its fair market value, which was rounded off to $322,000. The assessor classified the building on the Sternberg land as a class B average department store and determined its fair market value as $3,363,766. Pursuant to La. Const. of 1974, art. VII, § 18(A) and (B), the building (improvement) was listed on the assessment rolls at 15% of its fair market value, which was $504,560.
Sternberg contested the appraisals and assessments of its land and building. A hearing was held before the Commission on December 9, 1982. At this hearing, Sternberg asserted its building was a retail store and not a department store, the starting point valuation for the building should be $33.84 per square foot and not $41.88 per square foot as used by the assessor, and the 15% assessed value of the building should be $418,391 instead of $504,560. Sternberg asserted in a memorandum submitted to the Commission and filed of record that the fair market value and assessed value of the land should be determined as follows:
In the matter of the land, the assessor has determined his value by using a factor of $7. per sq. ft. While we believe this is too high by any standard, we reluctantly accept this factor for that portion of the land directly occupied by the building. This amounts to 2.54 acres of the 10.6 acre tract.
The remaining 8.06 acres, however, are, by contractual agreement, used for and dedicated to the sole purpose of parking.

* * * * * *
We feel a more equitable valuation of the parking area would be 2.15 per sq. ft. arrived at as follows:

Original Cost $15,000. per acre
Cost To Pave 50,000. per acre
 _______
 65,000.
44% Inflation Factor 28,800.
 _______
Value Per Acre $93,800.
 __________
Cost per Sq. Ft. $2.15
 ========

If this factor ($2.15 per sq. ft.) is used in determining the value of the parking area, the total value of the land would be *872 computed at $1,530,525. yielding an assessment of $153,053.[2]
(Emphasis added)
On April 22, 1983, the Commission ruled the assessor's appraisal and assessment of the land at $3,219,950 and $322,000, respectively, were correct. The Commission did not rule on the appraisal and assessment of the building at this time. On May 18, 1983, in a letter to Sternberg's attorney, the Commission acknowledged that it did not address all of the issues raised in Sternberg's appeal and ordered a new hearing "to receive additional evidence regarding the fair market value of the improvements." On May 20, 1983, Sternberg filed suit no. 267,024 to contest the Commission's April 22, 1983 ruling on the appraisal and assessment of the land.
The second hearing was held on June 23, 1983. At the commencement of the second hearing the chairman of the Commission announced that the Commission had "vacated its previous order which dealt specifically with the land values" and advised that the Commission would "hear both the question of the improvements as well as any additional evidence which they may wish to introduce as regards to the land values."[3] After hearing the evidence presented by the parties,[4] the Commission on August 30, 1983, rendered the following findings:
The beginning step in the appraisal process is to classify the improvements by class and type. The beginning point is the description of construction. These descriptions are broad at best and the appraiser's discretion is called for in reaching the starting point. A "B Average Department Store" is described as having an exterior of brick, concrete or metal and glass with shallow displays. The interior has plaster or drywall, acoustic tile, vinyl asbestos or rubber tile, adequate lighting and restrooms and is warm and cool air zoned. A "B Average Retail Store" has an exterior of brick or concrete, average metal display fronts, with interior of plaster or drywall, acoustic tile, rubber or vinyl asbestos *873 tile with adequate lighting, outlets, and small restrooms. It is also warm and cool air zoned. Goudchaux's is a single story structure with a small area of mezzanine in the non-selling area. However, provisions in the construction provide for the future addition of a second story. Additionally, the interior finish would seem to be of better quality than the average retail store with particular reference to the use of terrazzo, carpet and vinyl floor coverings. The Commission finds a "B Average Department Store" most nearly fits the construction involved in the Goudchaux's store.
From that starting point of $41.88 per square foot, adjustment must be made to remove the cost of elevators ($2.05 per square foot). Next, $ .77 must be added for the cost of sprinklers in a building of this size. After adjustments for perimeter, current cost and the local multiplier, a final square foot cost of $32.62 per square foot for the selling area is obtained. Both the assessor and the taxpayer agreed that 50% of the selling area cost was an accurate figure for the nonselling area. This results in a value before depreciation for the selling area of $2,534,574.00 and for the non-selling area of $708,865.00. These figures are then reduced for depreciation by 8% to reach a final fair market value of $2,983,964.00.
With regard to the value of the land, the Commission has already determined that the assessor has consistently valued the land in this area at $7.00 per square foot. The taxpayer argues that its position in the mall as an anchor store imposes certain conditions which make its operation more burdensome than that of a free standing store of comparable size and use. Further, the taxpayer urges that the Commission take into consideration that the taxpayer can purchase additional property from the mall owner at a fixed price equal to the purchase price originally paid.
The Commission has reviewed the real estate contract, the reciprocal operating agreement and the zoning regulations for the City of Lafayette. The Commission also enquired as to the possible dedication of the access and ring roads to the public use.
It is the finding of the Commission that Sternberg operates under conditions which are no more burdensome than those imposed by the zoning regulations for the parish. Further, no public dedication of the access or ring roads has taken place. It is, therefore, the finding of the Commission that no change is due on the assessment of the land.
Thus, to summarize, the assessor asserted the land (10.569 acres) had a fair market value of $3,219,950 ($7 per square foot) and should be assessed at $322,000 (10% of fair market value), and the building had a fair market value of $3,363,766 (an average of $27.76 per square foot) and should be assessed at $504,560 (15% of $3,363,766). Sternberg asserted its land had a fair market value of $1,530,525 ($2.15 per square foot for the parking area of 8.06 acres and $7.00 per square foot for the area under the building of 2.54 acres) and should be assessed at $153,053, and the building had a fair market value of $2,459,339 (an average of $20.30 per square foot) and should be assessed at $368,900 (15% of $2,459,339). The Commission found that the assessor's fair market value and assessment of the land was correct, but the fair market value of the building should be reduced to $2,983,964 (an average of $24.63 per square foot) which yields an assessed value of $447,594 (15% of $2,983,964).
On September 10, 1983, Sternberg filed suit no. 271,153 to judicially challenge the Commission's rulings on the 1982 assessments of its land and building.
On March 22, 1984, Sternberg filed suit no. 276,130 to judicially challenge its 1983 assessments.[5]
*874 On April 26, 1984, Sternberg exercised its option to acquire an additional 2.952 acres of land next to the mall at a purchase price of $44,280 ($15,000 per acre or $0.34 per square foot).
On November 13, 1984, suits 267,024, 271,153 and 276,130 were consolidated.
For the 1985 tax year, the assessor appraised Sternberg's 2.952 acre tract at $7.00 per square foot for a total fair market value of $900,123. This land was placed on the assessment rolls at 10% of its fair market value, or $90,012. Sternberg objected to this appraisal and assessment and asserted the property should be appraised at $15,000 per acre, or $44,280. Sternberg appealed this assessment to the Lafayette Parish Council (Council) which heard the matter on September 5, 1985. La.R.S. 47:1931 and 1992. At this hearing, counsel for Sternberg advised that "[W]e do complain as to the assessment for the entire tract of land, both the land sitting underneath the building and the parking lot." The issue of the classification of the building as a department store or a retail store also was raised. The Council voted not to change the assessments of the 2.952 acre tract, the parking lot or the building; it did not vote on the assessment of the land under the building. On September 19, 1985, Sternberg appealed to the Commission, but only contested the appraisal and assessment of the 2.952 acre tract in its notice of appeal. The Commission heard the case on October 17, 1985. On October 24, 1985, the Commission upheld the appraisal and assessment of the 2.952 acre tract with the following rationale:
In 1985, Sternberg exercised its option to purchase an additional tract of land adjacent to the ring road. This option was negotiated at the same time as the purchase of the original tract in 1977 and is for the same price per acre as the original tract. By agreement with the mall owners, Sternberg can only use the property for additional parking that would be required should it decide to expand the Goudchaux's store by adding a second story. Sternberg filed this appeal because a new parcel of property is involved and this appeal only involves the new parcel.
For this appeal, Sternberg hired an appraiser. However, they did not request that he do an appraisal. The substance of his testimony concerns the use of the property and one sale located just outside of the ring road but not fronting on either Johnston or Ambassador Caffery.
The Commission finds that the date of appraisal for real property for the 1985 tax year is January 1, 1981. The fair market value for real estate must be computed as of that date. The fair market value for real property is reassessed every four years and the 1985 tax year represents the last year of the present cycle. The assessor for Lafayette parish [sic] submitted several comparable sales in the vicinity of the property on dates which bridge the assessment date. The taxpayer had at its disposal an expert witness but that witness failed to make an appraisal or testify as to the fair market value of the property. The Commission finds that the price negotiated in 1977 or before include other considerations for the seller (mall owner). These include a future stream of income to the seller as an anchor tenant attracts consumers to the mall thereby increasing the probability that sales override clauses in the leases of smaller tenants will generate additional income for the owners. This is further illustrated by the taxpayer's allegation that a mall owner in East Baton Rouge parish [sic] is considering donating a location in a proposed mall in order to entice an anchor tenant to locate there.
The property under appeal was assessed to the mall owners based on a rate of $7.00 per square foot fair market value for the years 1982, 1983, and 1984. *875 Sternberg was aware of this assessment and was aware of the restrictions that would be contractually imposed should it choose to exercise its option on this particular parcel of land. Nevertheless, it chose to buy the property. For the reasons cited herein, the decision of the Lafayette parish board of review [sic] is upheld.
On November 13, 1985, Sternberg filed suit no. 295,016 to contest the appraisal and assessment of all of its property for the 1985 tax year.[6] On January 24, 1986, suit no. 295,016 was consolidated with the other three suits.
By order signed June 2, 1987, the trial court remanded suits nos. 267,024, 271,153 and 295,016 to the Commission "for the taking of additional evidence relating to the issue of uniform treatment, or lack thereof" and remanded suit no. 276,130 to the Commission "for any other purpose as authorized by law." The Commission received additional evidence and on March 11, 1988, concluded, in pertinent part, as follows:
For these reasons and the reasons originally stated in our decision dated October 24, 1985, the Commission finds that the assessment set by the Lafayette Parish assessor was based on the fair market value at that time. What the evidence presented by Sternberg tends to prove is that the assessments in East Baton Rouge and probably Orleans, were below fair market value, based in part on the assessors taking the original selling price to the anchor tenant as a starting point without conducting an independent market analysis to determine if the price reflected fair market value.
The record was returned to the trial court.
On August 4, 1988, the trial court issued written reasons for judgment in which it held that the assessment of Sternberg's property in Lafayette was wrong as a matter of law because: (1) the purchase price paid by Sternberg in acquiring the property was not considered in determining fair market value, (2) the property was appraised "as if vacant," rather than appraising it in light of the uses and purposes to which the property is best adapted and for which it can legally be used as required by La.R.S. 47:2321, (3) the "appraisal figures for noncomparable, non-mall property outside the confines of Acadiana Mall such as bank sites, restaurant locations or office buildings" were used to determine fair market value, and (4) no consideration was given as to how other parishes, such as East Baton Rouge and Orleans, appraise and assess "anchor tenant sites." The trial court held there was a "lack of uniformity" from parish to parish in appraising and assessing anchor tenant sites, as evidenced by the $7.00, $3.00 and $1.65 per square foot values used in Lafayette, Orleans and East Baton Rouge Parishes, respectively. The trial court then concluded as follows:
Accordingly, this Court finds that the $7.00 per square foot appraisal figure, as applied to Sternberg's property (2.54 acres of anchor store, 8.02 acres of parking lot, and 2.95 acres of vacant property on the ring road) is improper and, as a matter of law, cannot be tolerated.
Sternberg's position is correct. The Commission's original and amended decisions in these consolidated cases are reversed and remanded. The Louisiana Tax Commission shall then direct the Lafayette Parish Assessor to reappraise and reassess the Sternberg property under the criteria used in East Baton Rouge Parish, by starting with the purchase price of the property and scaling upward for inflationary factors.3 This change of procedure will cause Lafayette Parish to become more uniform with other parishes dealing with the same type properties.
3 The Court notes that Sternberg presented evidence at the Board of Review and the Commission such that $2.15 per square foot was appropriate for its property in Lafayette Parish. This Court is not mandating that the Assessor adopt the $2.15 number when reappraising the Sternberg property; however, that figure is within the "realm of reason" given the evidence *876 viewed by this Court as to East Baton Rouge Parish and Orleans Parish.
The reasons for judgment did not discuss the appraisal and assessment of the Sternberg building.
On August 17, 1988, the trial court rendered and signed a judgment which: (1) "reversed and remanded" the Commission's decisions of October 24, 1985 (pertaining to the 1985 assessment of the 2.952 acre tract of land) and of March 11, 1988 (pertaining to uniform treatment in suits nos. 267,024, 271,153 and 295,016 and all issues in suit no. 276,130), (2) ordered the Commission to direct the assessor "to reappraise and reassess the ... Sternberg ... property under the criteria set forth in the Reasons for Judgment," and (3) ordered the Commission to direct the taxing authorities holding taxes paid under protest for the years 1982, 1983 and 1985 to refund those taxes to Sternberg with interest. The judgment does not specifically reverse the August 30, 1983 decision of the Commission which affirmed the appraisal and assessment of the 10.569 acre tract of land and which reduced the appraisal and assessment of the building thereon, and the judgment does not address the reappraisal and reassessment of the building.
On September 13, 1988, the Commission took this suspensive appeal.
FAIR MARKET VALUE OF THE LAND[7]
(Assignments of error 1 and 2)
The Commission asserts the trial court "erred [sic] its determination that property is not uniformly assessed" and "in its implied conclusion that the correct method of appraising property is by indexing unsubstantiated purchase price and that this would produce a value of $2.15 per foot."
Applicable Law
La. Const. of 1974, art. VII, § 18 is entitled Ad Valorem Taxes and provides as follows:
(A) Assessments. Property subject to ad valorem taxation shall be listed on the assessment rolls at its assessed valuation, which, except as provided in Paragraph (C), shall be a percentage of its fair market value. The percentage of fair market value shall be uniform throughout the state upon the same class of property.

(B) Classification. The classifications of property subject to ad valorem taxation and the percentage of fair market value applicable to each classification for the purpose of determining assessed valuation are as follows:

Classifications Percentages
1. Land 10%
2. Improvements for residential purposes 10%
3. Electric cooperative properties, excluding
 land 15%
4. Public service properties, excluding land 25%
5. Other property 15%

The legislature may enact laws defining electric cooperative properties and public service properties.
(C) Use Value. Bona fide agricultural, horticultural, marsh, and timber lands, as defined by general law, shall be *877 assessed for tax purposes at ten percent of use value rather than fair market value. The legislature may provide by law similarly for buildings of historic architectural importance.
(D) Valuation. Each assessor shall determine the fair market value of all property subject to taxation within his respective parish or district except public service properties, which shall be valued at fair market value by the Louisiana Tax Commission or its successor. Each assessor shall determine the use value of property which is to be so assessed under the provisions of Paragraph (C). Fair market value and use value of property shall be determined in accordance with criteria which shall be established by law and which shall apply uniformly throughout the state.

(E) Review. The correctness of assessments by the assessor shall be subject to review first by the parish governing authority, then by the Louisiana Tax Commission or its successor, and finally by the courts, all in accordance with procedures established by law.
(F) Reappraisal. All property subject to taxation shall be reappraised and valued in accordance with this Section, at intervals of not more than four years. (Emphasis added)
The legislature has complied with the mandate of La. Const. of 1974, art. VII, § 18(D) by enacting La.R.S. 47:2321 and 47:2323 which provide as follows:
§ 2321. Fair market value; defined
Fair market value is the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.

§ 2323. Criteria for determining
A. The criteria for determining fair market value shall apply uniformly throughout the state. Uniform guidelines, procedures and rules and regulations as are necessary to implement said criteria shall be adopted by the Louisiana Tax Commission only after public hearings held pursuant to the Administrative Procedures Act.1
B. Each assessor shall follow the uniform guidelines, procedures, and rules and regulations in determining the fair market value of all property subject to taxation within his respective parish or district. Any manual or manuals used by an assessor shall be subject to approval by the Louisiana Tax Commission or its successor agency.
C. Criteria.
The fair market value of real and personal property shall be determined by the following generally recognized appraisal procedures: the market approach, the cost approach, and/or the income approach.
(1) In utilizing the market approach, the assessor shall use an appraisal technique in which the market value estimate is predicated upon prices paid in actual market transactions and current listings.
(2) In utilizing the cost approach, the assessor shall use a method in which the value of a property is derived by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land, if any.
(3) In utilizing the income approach, the assessor shall use an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income.
1 R.S. 49:951 et seq.
(Emphasis added)
La. Const. of 1974, art. VII, § 18, La.R.S. 47:2321 and La.R.S. 47:2323 must be construed in pari materia. La.C.C. art. 13.
*878 The following are the pertinent constitutional and statutory principles applicable in this case. The percentage of fair market value at which taxable property is assessed "shall be uniform throughout the state upon the same class of property." La. Const. of 1974, art. VII, § 18(A). For Sternberg's land, that percentage is 10%, and for Sternberg's commercial (nonresidential) building, it is 15%. La. Const. of 1974, art. VII, § 18(B); La.R.S. 47:2322(A), (B) and (C). Each assessor shall determine fair market value of all property subject to taxation in his parish. La. Const. of 1974, art. VII, § 18(D). The legislature shall establish the criteria by which the assessor shall determine fair market value, and these criteria "shall apply uniformly throughout the state." La. Const. of 1974, art. VII, § 18(D); La.R.S. 47:2323(A). Only three criteria have been established by the legislature in La.R.S. 47:2323(C): the market approach, the cost approach, and/or the income approach. One of these criteria must be used to determine the fair market value of Sternberg's land.
If the income approach is used, the assessor must "use an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income." There is no "net income" evidence in the record before us. Thus, the income approach criterion cannot be used in this case.
If the cost approach is used, the assessor must "use a method in which the value of a property is derived by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land, if any." (Emphasis added). This approach apparently contemplates a lump sum or single fair market value for improvements or combined improvements and land. This approach does not fit the facts of this case. As previously indicated in footnote 7, the issue of the fair market value of Sternberg's improvement (building) is not before us. It is not possible to assess Sternberg's land and building in a lump sum fair market value because the land and building are assessed at different rates. Sternberg's land is assessed at 10% of fair market value and its improvement (building) is assessed at 15% of fair market value. Thus, the fair market values of the land and building must be determined separately, not in a single valuation.[8] Finally, even if this approach could be used, the market value of the land must be determined.
If the market approach is used, "the assessor shall use an appraisal technique in which the market value estimate is predicated upon prices paid in actual market transactions and current listings". (Emphasis added)
Validity of the Fair Market Value Criterion Used By the Lafayette Assessor
The assessor in the instant case utilized the market approach. The Commission fixed the valuation (lien) date for the four year taxing period starting in 1982 as January 1, 1981. The testimony of record shows that the assessor tried to determine market value by looking for current "actual market transactions" (comparable sales) which occurred within three to six months before or after January 1, 1981. He also retained Allen J. Angers, an expert realtor and appraiser, to assist in the reappraisal. No current sales of "anchor tenant sites" were found in Acadiana Mall. Thus, sales from the immediate vicinity of the mall location at the corner of Ambassador Caffery Parkway and Johnson Street were researched.
The first sale considered was executed in February of 1981 by Bells Marina to Lafayette Shooters Supply. It involved a 1.55 acre tract of land and improvements fronting on Ambassador Caffery Parkway which was sold for $550,000. The improvements were valued at $80,000. Thus, the land was sold for $6.94 per square foot. The second sale considered was executed on April 8, 1980, by Dwight W. Andrus, Jr. to Atlantic Richfield. It involved 6.118 *879 acres of wooded land fronting on Ambassador Caffery Parkway which was sold for $2,531,531.50, or $413,784.16 per acre, or $9.50 per square foot. The third sale considered was executed on November 8, 1980, by Dwight W. Andrus, Jr. to Huey J. Wilson. It involved a 4.168 vacant tract of land fronting on Ambassador Caffery Parkway which was sold for $1,102,057.50, or $264,409.19 per acre, or $6.07 per square foot.
After considering these current actual market transactions, and after consulting with his staff and with Angers, the assessor fixed the fair market value of Sternberg's land at $7.00 per square foot, or $304,920 per acre. The fair market value of the land of the other "anchor tenants" in the mall and the land of other landowners in the immediate vicinity also was fixed uniformly at $7.00 per square foot. The assessor correctly followed La. Const. of 1974, art. VII, § 18 and La.R.S. 47:2321 and 2323. The trial court holding to the contrary is wrong.
Validity of the Fair Market Value Criterion Used By the Trial Court
The trial court ordered the assessor "to reappraise and reassess the Sternberg property under the criteria used in East Baton Rouge Parish, by starting with the purchase price of the property and scaling upward for inflationary factors." This order is contrary to the criteria provided for in La.R.S. 47:2323. The trial court's criterion is not the market approach, the cost approach or the income approach. None of these statutorily mandated criteria[9] make reference to the taxpayer's original purchase price or inflation. There can be a substantial difference between the taxpayer's purchase (acquisition) price and "market value estimate ... predicated upon prices paid in actual transactions and current listings." (Emphasis added). For example, a taxpayer may acquire land by donation, inheritance, exchange or "friendly" sale at less than market value. Further, inflation may have no bearing on current market values in an area where property values are depressed for various reasons.
Use Value and Appraisal of Land as if Vacant
The trial court held the assessor committed legal error by appraising the land "as if vacant" and by not considering its use as an "anchor tenant site", citing La.R.S. 47:2321.
The constitution requires that all taxable property be assessed at a percentage of its fair market value, except bona fide agricultural, horticultural, marsh and timber land which is assessed at 10% of its use value. Under the constitution, "land" is assessed at 10% of its fair market value and "other property" is assessed at 15% of fair market value. What constitutes "land" and "other property" is defined in La.R.S. 47:2322, which provides in pertinent part, as follows:
For the purposes of this Act, the following words and phrases shall have the meanings ascribed to them unless the context clearly indicates otherwise:
A. "Land" shall mean all land other than those lands assessed as agricultural, horticultural, marsh and timber lands as defined by law.
B. "Improvements for residential purposes" shall mean single family dwellings, duplex, triplex, fourplex, apartment buildings, condominiums, and mobile homes used as a residence, whether on land owned, rented or leased.
C. "Other property" shall mean all properties not included in A or B above and shall include both real and personal property as defined herein.
Sternberg made improvements on its land for commercial (not residential) purposes. Accordingly, the improvements on Sternberg's land are "other property." Further, Sternberg's land is assessed at a different rate (10%) from Sternberg's other property (15%), and, thus, must be assessed separately. In that sense, the land is assessed "as if vacant."
*880 Neither the constitution, nor the statutory law (including La.R.S. 47:2321), recognizes a tax classification based on use of land as an "anchor tenant site." Therefore, "anchor tenant sites" must be assessed, as all other nonuse value land is assessed, pursuant to fair market value as determined by the criteria of La.R.S. 47:2323. As previously indicated, the definition of fair market value found in La.R.S. 47:2321 must be interpreted in pari materia with La.R.S. 47:2323.
In brief Sternberg relies on La.R.S. 47:2321 and argues as follows:
"Fair market value" is, therefore, defined in terms of "price" [which Lafayette ignores] and in terms of the "uses and purposes to which the property is best adapted and for which it can legally be used" [which Lafayette also ignores].
La.R.S. 47:2321 defines fair market value, in part, as "the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances." (Emphasis added). The phrase "the price for property which would be agreed upon" must be construed according to its common and approved usage. La.R.S. 1:3. The tense of the verbs "would be agreed" is future subjunctive; it is not past or present tense. This language is clear and free of ambiguity. La.R.S. 1:4. This language does not say that only the original acquisition cost of the property being assessed can be considered. Further, it is undisputed in the record that the highest and best use of Sternberg's land is use as an "anchor tenant" site in a mall. The record shows that the assessor determined the fair market value of Sternberg's land on that basis.
Validity of the Lafayette Assessor's Comparable Sales
The trial court ruled the sales considered by the assessor were "non-comparable" and should not have been used to determine fair market value.
A comparable sale is a recent sale of a similar tract of land in the same vicinity of the land to be valued; a comparable sale is the best evidence of market value.[10]State, Department of Highways v. Covington Interstate, Inc., 295 So.2d 828 (La.App. 1st Cir.), writ denied, 299 So.2d 801 (La.1974). However, it is questionable whether there is any such thing as a precisely comparable sale. State, Department of Highways v. Brannon, 348 So.2d 1301 (La.App. 3rd Cir. 1977). Generally, comparable sales have to be adjusted after considering the numerous factors that affect market value. In Recreation and Parks Commission, Parish of East Baton Rouge v. Loret, 263 So.2d 467, 472-473 (La.App. 1st Cir.1972) this court observed as follows:
In the case at hand, we find that the trial court correctly fixed value on the market data concept basis rather than using the speculative residual subdivision value approach urged by Appellant. Mr. Brown found the Milburn sales most comparable to subject property, and also relied on the Gully transaction, although admittedly there were some differences *881 between the Gully tract and subject property. The thrust of Appellant's argument appears to be that no comparables should be considered unless they are precisely similar to the property taken. The possibility of such an occurrence is indeed remote. It suffices that a comparable be similar to the property taken to such extent that a comparison of values may reasonably be made making allowance for differences in size, shape, location and other factors normally affecting value. (Emphasis added)
Allen J. Angers, the assessor's expert appraiser, testified as follows at his January 23, 1986 deposition:
Q. Would you agree that that was its highest and best use at the time that you were doing the appraisal work?
A. Yes, based on the improvements that had been installed on the adjacent land and roads, utilities and everything that were brought in, the other buildings that were constructed and the type of commercial district that had been created. It seemed to me that that particular site had a highest and best use as a department store, you know, in conjunction with the mall.
Q. Okay. Now, given that, when you were working through the appraisal process that gave us the $7.00 number, did you look back and say that Goudchaux's land portion of the property could have been used for something else or did you look at it as if it was vacant, nothing there or what? That's the point I'm having trouble with.
A. I looked at it in both ways. I looked at it first as if it was vacant to estimate the value of the land. I considered there right at that point what were the uses that it was best adapted to. And it was obviously some type of commercial enterprise in conjunction with the mall. It could have been a department store or it could have been a sixth building of the mall owners if they so desired which could have been subdivided into any number of smaller retail outlets such as the 117 small shops that you have in the mall.
Q. Okay. At the point in time when you looked at the appraisal problem as if vacant, did you come up with a number to be applied to the property at that point?
A. $7.00 a square foot.
Q. Okay. I think the second part you said was you considered the uses or potential uses of that property if it was vacant; is that correct?
A. Well, this is what I was just talking about. All of the uses to which it could be put legally and which were economically feasible if the building were not present.
Q. Okay. At the point in time that you were coming up with the $7.00 number for the Goudchaux's tract, had the other sites along Ambassador Caffery and Johnson Street, the bank, the oil company building, Bells Marina and those type establishments, had they already been appraised at the $7.00 number?
A. It was all done, insofar as I'm concerned, at the same time.
Q. Okay. Do you recall which was done first?
A. They were all done at the same time.
Q. Okay. Were there any factors which caused you to differentiate between the Acadiana Mall Property that Goudchaux's sits on and the locations along Ambassador Caffery and Johnson Street that made you question whether there should be the same appraisal number used or some different numbers used?
A. There may have been. I don't recall that. Apparently they were not significant since I arrived at the same conclusion for the Ambassador Caffery, Johnson Street, Acadiana Mall segment.
Q. What factors would cause you to apply a different number?

*882 A. Any factor which can create, modify or destroy a value was considered.
Q. What would those be? Educate me on that.
A. Well, the four big factorswe're going to go into a planning and education section. The four big factors which create and modify or destroy value would be social, political, governmental or physical factors which bear against the property.
Q. In order to shorten the process, can we focus on physical factors? What physical factor?
A. Well, then the physical factors would be those with reference to access, utilities, adjacent improved uses, the traffic flow, the reputation of the immediate vicinity for commercial purposes, shopping stores, security of your person, you know, in using these facilities and so forth.
Q. Did you place any emphasis at all on the fact that the comparables that you were looking to fronted on Johnson Street and Ambassador Caffery whereas the mall property itself was somewhat set off from those two streets?
A. I certainly did. And analyzing and I believe I mentioned this to you the other day, in analyzing the Acadiana Mall, I felt that the street improvements and utilities which had been installed and other commercial buildings that had been built in the Acadiana Mall had in effect created what was equivalent to what we used to refer to as a central business district or downtown. It hadthis isthis is the downtown of Lafayette even though it's the southwest perimeter. This is the shopping center of Lafayette. And Acadiana Mall is supplementary in a lot of respects to Acadiana MallI mean Ambassador Caffery is supplementary to Acadiana Mall and has received the benefit of a throw off of value from Acadiana Mall. It's not the other way.
Q. Okay.
A. Acadiana Mall was not enhanced in value by virtue of two lane Ambassador Caffery because it was a very nominal street before the Acadiana Mall was undertaken. And Johnson Streetwe were at the very end of the commercial district on Johnson before Acadiana Mall came in. The improvements that were created by Acadiana Mall changed the commercial face of that section of Lafayette.
Q. So if I understand you right, you're saying that the mall itself helps create values in that area?
A. Oh, it was a major impact on values in that vicinity and I think anyone knowledgeable of Lafayette would recognize that fact.
Q. Would you agree that the anchor tenants within the mall helped create the value of the mall?
A. All of the partners in the mall construction helped to create the mall.
The fact that the land in the assessor's comparables was not the land of an "anchor tenant" in the Acadiana Mall does not affect their admissibility or legality as comparable sales for purposes of determining fair market value; that fact is pertinent only in determining what weight should be given the comparables. Cf. Blaize v. Cazezu, 210 La. 176, 26 So.2d 689 (1946); Louisiana Ry. & Navigation Co. v. Morere, 116 La. 997, 41 So. 236 (1906); Louisiana Intrastate Gas Corporation v. Gulf Outlet Lands, Inc., 542 So.2d 705 (La.App. 4th Cir. 1989); Rogers v. Read, 355 So.2d 46 (La.App. 2nd Cir.1978); Louisiana Highway Commission v. Merchant, 174 So. 696 (La.App. 2nd Cir.1937). Since there were no sales of "anchor tenant" land in the Acadiana Mall within a reasonable time before or after the valuation (lien) date of January 1, 1981, the comparables used by the assessor were the best sales available in the immediate vicinity.[11] The assessor *883 and the Commission correctly considered the comparable sales. They apparently found these comparables were credible and used them to support their decisions. We have reviewed the record and conclude that this factual finding was not manifestly erroneous or clearly wrong.
Uniformity
On the issue of uniformity, the trial court observed that "uniform efforts must be made by assessors to determine `fair market value' for those [anchor tenant] sites" and then stated the following:

Bussie v. Long, 286 So.2d 689 ([La.App.] 1st Cir.1973), which pre-dated the 1974 Constitution, required uniformity of tax treatment. Art. 7 Sec. 18 makes this mandate constitutional. The First Circuit has held that lack of uniformity may be shown through "underassessment" of taxpayers similarly situated. In re Protest of Dow Chemical Company, 458 So.2d 955 (La.App. 1st Cir.1984). This Court believes that "overassessment" of taxpayers similarly situated also demonstrates that same lack of uniformity.
As previously indicated, the La. Const. of 1974, art. VII, § 18 addresses the question of uniformity in two places; they are paragraphs (A) and (D). Paragraph (A) mandates that the assessment percentage of fair market value upon the same class of property shall be uniform throughout the state. Paragraph (B) of La. Const. of 1974, art. VII, § 18 fixes the assessment percentage of fair market value of land at 10%. The Lafayette assessor used that percentage in the instant case.
Paragraph (D) mandates that fair market value shall be determined in accordance with criteria established by law and applied uniformly throughout the state. In La.R.S. 47:2323(C) those criteria were established and defined by the legislature as the market approach, the cost approach and the income approach. As previously indicated, the criterion used by the Lafayette assessor complies with Paragraph (D) and La.R.S. 47:2323(C); the criterion prescribed by the trial court does not.
The evidence shows that Sternberg's regional mall properties in East Baton Rouge, Lafayette and Orleans Parishes have been appraised at three different fair market values. However, this does not necessarily prove that the Louisiana constitutional and statutory scheme for appraising and assessing land has been violated. That scheme requires that the percentage of fair market value upon which land is assessed throughout the state be uniform and that fair market value shall be determined by criteria applied uniformly throughout the state; it does not require that similar lands located in different areas of a parish or the state have a uniform fair market value. As previously indicated, there are many factors which influence the fair market value of land, and one of those is location. Thus, an expanding economy can cause an increase in land values in one locality, and a depressed economy can cause a decrease in the value of similar land in another locality. As pointed out in testimony in the record, even individual lots in the same subdivision can have different values depending on their locations. This is one reason why the market approach is used to determine the fair market value of land.
We agree that the criterion used to determine the fair market value of Sternberg's land in the Acadiana Mall in Lafayette is different from the criterion used to determine the fair market value of Sternberg's land in the Cortana Mall in East Baton Rouge Parish.[12] The criterion used in East Baton Rouge Parish was the model used to fashion the trial court's judgment herein. As previously indicated, that criterion is not provided for in La.R.S. 47:2323; the *884 Lafayette assessor used the correct criterion.
Conclusion
These assignments of error have merit.[13]
DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and the rulings of the Commission pertaining to the appraisal and assessments of Sternberg's land are reinstated. Sternberg is cast for all costs of these proceedings.
REVERSED AND RENDERED.
NOTES
[1] The first two actions, nos. 267,024 and 271, 153, pertain to the 1982 tax year.
[2] This same argument was made orally to the Commission, except the inflation factor was stated as 45%. See pages 3 and 4 of the transcript of the December 9, 1982 hearing.

Sternberg calculated there were 8.06 acres used for parking. The survey of the original tract of land shows it contained 10.569 acres. If the building occupied 2.540 acres, then 8.029 acres (10.569 minus 2.540) were used for parking, not 8.06 acres.
Sternberg acquiesced in the $7.00 per square foot fair market value for the 2.54 acres occupied by the building. Thus, the fair market value for the 2.54 acre portion of the land is $774,497 (2.54 acres times 43,560 square feet per acre times $7.00 per square foot). If Sternberg's 8.06 acreage for parking is used, the fair market value of the land used for parking is $756,028 (8.06 acres times $93,800 per acre). Thus, the fair market value of the land per Sternberg's calculations is $1,530,525 ($774,497 plus $756,028), and the assessed value is $153,053.
[3] Because the Commission vacated its April 22, 1983 ruling pertaining to the land, suit no. 267,024 was rendered moot.
[4] At the June 23, 1983 hearing Sternberg's counsel argued that its property should be assessed as follows:

Goudchaux's had concluded that as to land value that it would be entirely appropriate to take its original cost, which is fifteen thousand dollars ($15,000.) an acre, and add to it the cost of improving it in the parking area, which was approximately another fifty thousand dollars ($50,000.), and they decided that a forty-four percent (44%) upward adjustment to account for roughly three (3) years inflation to be fair, in my opinion, being extremely generous, and that created a composite value of about two dollars and fifteen cents ($2.15) a square foot I'm sorry, that would have reduced the land assessment as to the parking area to a million, five hundred thirty thousand, five hundred and twenty-five dollars ($1,530,525.). I really think that overprices the parking area because I believe that even at that price you could not attract an anchor tenant into a mall because it wouldn't be feasible to operate. But, I would certainly imagine that an assessment within that range would be something that Goudchaux's could live with. With regard to the building, I really did it, and these are my own conclusions and my assumptions, that if you assume that we are an average retail store and begin with the cost of thirty-three dollars and eighty-four cents ($33.84), and make the adjustments for elevators, and heating and cooling, and use the other numbers that the assessor did, we would come up with a total building value of two million, four hundred (2,400,000)five hundred (500) excuse metwo million, four hundred fifty-nine thousand, three hundred and thirty-nine dollars ($2,459,339.).
[5] In its answer to this suit, the Commission contended that Sternberg "failed to properly follow the administrative procedure ... to review the 1983 assessments" and "is estopped from litigating the 1983 assessment." The record before us does not reflect a ruling by the trial court on this issue. See La. Const. of 1974, art. VII, § 18(E); La.R.S. 47:1989, 1992, 1998 and 2110; Westminster Management Corporation v. Mitchell, 525 So.2d 1171 (La.App. 4th Cir.), writ denied, 532 So.2d 132 (La.1988); Lowrey Chevrolet, Inc. v. Brumley, 510 So.2d 1294 (La.App. 3rd Cir.1987); Capital Drilling Company v. Graves, 496 So.2d 487 (La.App. 1st Cir. 1986). However, the Commission has not assigned error concerning this.
[6] There is no suit filed in the record before us for the 1984 tax year.
[7] The trial court reasons for judgment and judgment are silent on the issue of the fair market value and the assessed value of the Sternberg building. Silence in a judgment as to any part of a demand made in litigation is construed as a rejection of that part of the claim. Harmon v. Schamberger, 536 So.2d 579 (La.App. 1st Cir. 1988); Day v. Warren, 524 So.2d 1383 (La.App. 1st Cir.1988); Thurman v. Thurman, 521 So.2d 579 (La.App. 1st Cir.1988); Hendrix v. Hendrix, 457 So.2d 815 (La.App. 1st Cir.1984); Rills v. Southern Bell Telephone Co., 305 So.2d 596 (La. App. 1st Cir.1974). Sternberg has not appealed or answered the appeal to object to the silence of the trial court on this portion of the claim. Accordingly, we conclude this issue is not before us and decline to address it. Further, at page 6 of its appellate brief, Sternberg observes that "[T]hese consolidated cases concern the ad valorem tax issues for Sternberg's land at Acadiana Mall in Lafayette for the tax years 1982, 1983 and 1985." At page 14 of its appellate brief, Sternberg observes that it did "offer evidence at the Board of Review and Tax Commission in these cases that $2.15 per square foot was an appropriate fair market value." The $2.15 per square foot figure obviously does not apply to the fair market value of the building. Sternberg does not assert another fair market value in its brief and does not complain therein about the silence of the trial court reasons for judgment and judgment on the fair market value of the building issue.
[8] It would seem that the cost approach could be used for determining the fair market value of residential land and improvements because both are assessed at 10% of fair market value.
[9] When the word "shall" is used in the Revised Statutes, it is mandatory. La.R.S. 1:3.
[10] It would appear that what constitutes market value for determining just compensation in expropriation cases under La. Const. of 1974, art. I, § 4 is essentially the same as the market approach criterion for determining fair market value for assessment purposes. In State, Department of Highways v. Cartlidge, 258 So.2d 175, 176 (La.App. 2nd Cir.1972) appears the following:

Before discussing the facts we will state some general principles applicable to compensation of the landowner in expropriation cases. These principles are so well settled that citation is not necessary. "Just and adequate compensation" as required by the Louisiana Constitution is the market value of the land taken. Market value is the price which a willing and informed buyer would pay a willing and informed seller in usual circumstances in light of the highest and best use to which the property may be put in the not too distant future. The best method of ascertaining what a willing and informed buyer would pay a willing and informed seller in usual circumstances in light of the highest and best use to which the property may be put in the not too distant future is through the use of comparable sales. Comparable sales are recent sales of similar property in the vicinity of the property to be expropriated. Testimony of expert witnesses is given effect where it appears to be based on sincerity and good reasoning.
[11] We do not wish to imply that recent sales of "anchor tenant" sites in other localities in Lafayette Parish or the State of Louisiana are not admissible or legal for determining market value. Such sales are admissible or legal for that purpose. Their similarity and proximity to the Acadiana Mall affects what weight should be given them. The failure to consider such sales is relevant to determine what weight should be given to the fair market value opinion in question.
[12] Although the record shows the appraised and assessed values of Sternberg's land in Plaza Lake Forest Mall in Orleans Parish, it does not clearly show what criterion was used to establish that value.
[13] Because we find merit in the Commission's assignments of error 1 and 2, it is unnecessary for us to rule on the Commission's assignment of error 3 which contends the trial court "erred in directing the refund of ad valorem taxes held in escrow pending the final outcome of these matters." Compare La.R.S. 47:1998(F) with La. R.S. 47:2110(A).