533 So.2d 999 (1988)
In the Matter of John W. McGOWAN.
No. 87 CA 0677.
Court of Appeal of Louisiana, First Circuit.
October 12, 1988.
Rehearing Denied November 30, 1988.
Writ Denied February 17, 1989.
*1000 Gary L. Boland, Hunter and Boland, Baton Rouge, for appellant John W. McGowan.
Ann C. Coco, Sr. Atty., Dept. of Environmental Quality, John B. Sheppard, Jr., Asst. Atty. General, Baton Rouge, for appellee State of La.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
The Louisiana Department of Environmental Quality, Office of Water Resources (DEQ) issued a compliance order to John W. McGowan, as owner and operator of the DeVilbis, Kratzer and Taylor production *1001 leases located in the Roanoke Field of Jefferson Davis Parish. The compliance order was issued for alleged violations of the Environmental Quality Act on the sites, the discharge of oil field wastes and failure to notify the DEQ of the discharges. A civil penalty in the sum of $5000 was assessed against McGowan for the violations. Upon McGowan's request an administrative hearing was held. The findings of fact, conclusions of law and recommended penalty of the Hearing Officer were adopted by the Secretary. The charges for violations at the Kratzer lease were dismissed. McGowan was found to have discharged oil field waste at the Taylor and DeVilbis sites in violation of the Environmental Quality Act and to have failed to notify the appropriate authorities of the unauthorized discharges. Penalties were assessed against McGowan in the sums of $5000 for the salt water discharge at the DeVilbis site; $25,000 for failure to notify DEQ of the discharge; $1000 for the oil spill at the Taylor site; and $25,000 for failure to notify DEQ of the oil spill. From this assessment of penalty McGowan appeals alleging twenty-one assignments of error.
In the first assignment of error appellant alleges that the Secretary erred in assessing a $1,000 penalty for the Kratzer oil spill and $25,000 for the failure to notify authorities of the spill. It is uncontested that less than one-half barrel of oil was spilled at the Kratzer site and that a spill of this quantity does not give rise to notification requirements. DEQ concedes in brief and the record reflects that in the proposed findings of fact the hearing officer found that the charges for violations at the Kratzer site had been dismissed. However in the proposed penalty recommendations the hearing officer mistakenly referred to the 10 barrel oil spill at the Taylor site as the Kratzer site. The order issued by the Secretary does not refer to violations at the Kratzer site nor was a penalty assessed for the alleged Kratzer violations. The Secretary merely assessed a $56,000 penalty against McGowan for the DeVilbis salt water discharge and the Taylor 10 barrel oil spill. This assignment of error has no merit.
In brief McGowan concedes the occurrence of the salt water discharge at the DeVilbis site and the oil spill at the Taylor site. However, in the third, fourth, fifth, sixth, seventh, eighth, twelfth, thirteenth, fourteenth, eighteenth, nineteenth, twentieth and twenty-first assignments of error McGowan contends that the oil spill and salt water discharges do not constitute pollutants as defined under the Environmental Quality Act; did not enter waters of the state as defined under the Environmental Quality Act; and did not give rise to a duty to notify DEQ. He further alleges that the Secretary erred in determining that the discharges violated Louisiana Water Pollution Control Regulation §§ 2.I.B and 3.I.D; Order of the Stream Control Commission, July 1, 1968; Rules 2 and 7 of the Stream Control Commission as amended January 27, 1953; La.R.S. 30:1073, 1095, 1096 and Notification Regulations and Procedures for Unauthorized Discharges §§ 9.3.5, 9.3.6.
The Secretary found that salt water was discharged from a salt water pit located on the DeVilbis site on or about January 31, 1986. The salt water exited the pit through a bleeder pipe and open valve which exited the east levee of the pit and extended 50 yards to the edge of a storm water drainage ditch on the DeVilbis site. The drainage ditch enters Gum Gully Canal which flows into Bayou Chene and comprises part of the Intracoastal-Mermentau-Lacassine Basin.
On February 28, 1986, DEQ water pollution specialist Kirk Manuel investigated an oil spill of an estimated 10 barrels of oil on the Taylor site. The oil spilled over the containment wall and traveled 200 yards through a drainage ditch. The flow was diverted from the ditch and traveled easterly into a cow pasture for 350 feet. The oil flow was diverted from the ditch by McGowan in order to prevent the oil from flowing through the remaining 600 feet of the ditch and into Gum Gully Canal.
Part IV of the Louisiana Environmental Quality Act, the Louisiana Water Control Law (La.R.S. 30:1091-1098), provides:

*1002 The legislature finds and declares that the waters of the state of Louisiana are among the state's most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this state. To insure the proper protection and maintenance of the state's waters, it is necessary to adopt a system to control and regulate the discharge of waste materials, pollutants, and other substances into the waters of the state.
La.R.S. 30:1092.
Under La.R.S. 30:1096 of the Louisiana Water Control Law:
A. (1) No person shall discharge or allow to be discharged into any waters of the state:
(a) Any waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation; or
(b) Any substance, the discharge of which violates any term, condition, or limit imposed by a permit.
(2) The provisions of this Part shall not apply to any unintentional nonpoint-source discharge resulting from or in connection with the production of raw agricultural, horticultural, or aquacultural products.
(3) No person shall violate any rule or regulation adopted under this Part or the terms of any permit or order issued under authority of this Chapter.
. . . .
Any activity resulting in the discharge of any substance into the waters of the state without a required license or permit is prohibited. La.R.S. 30:1095; Louisiana Water Pollution Control Regulation § 2.I.B. The "discharge of any pollutant in quantities exceeding permitted limits or a discharge from a source or at a location not authorized by a permit shall be a violation of the Act." Louisiana Water Pollution Control Regulation § 3.I.D. Additionally, the Order of the Stream Control Commission, effective July 1, 1968, provides, with certain exceptions, that no oil field wastes shall be allowed to drain or flow into waters of the state.
Appellant contends that the legislature has failed to set qualitative and quantitative standards for certain terms such as "pollutant" and water pollution, thus allowing for arbitrary and capricious interpretation of the statutes by DEQ.
Standards accompanying a delegation of legislative authority need not be express if they may be reasonably inferred from the statutory scheme as a whole. State v. Union Tank Car Co., 439 So.2d 377 (La.1983).
"Water pollution" is statutorily defined as the "introduction into waters of the state by any means ... of any substance in concentrations which tend to degrade the chemical, physical, biological, or radiological integrity of such waters...." La.R.S. 30:1093(4). "Pollutant" is defined in Louisiana Water Pollution Control Regulation (1)(IV) as "any substance introduced into the waters of the State by any means that would tend to degrade the chemical, physical, biological, or radiological integrity of such environment."
Louisiana Water Quality Standards § VII(B) establishes general criteria for water quality standards; § (C)(2) sets the chloride concentration in ancillary streams and waterbodies at 500 milligrams per liter; and Table 05 of section X establishes the chloride concentration in the Mermentau River Basin to be 90 milligrams per liter.
Manuel inspected the DeVilbis site on January 31, 1986. Brown or rust-colored standing water was observed in the ditch indicating that the chlorides had oxidized. He determined that a substantial discharge had occurred based on evidence of a recent drop in the salt water pit level and the damp stains on the cement pad under the valve. Manuel obtained samples of the standing water. The laboratory reports indicated the chloride content of the water located near the open valve to be 5900 parts per million; the water sample obtained 200 yards downstream indicated a chloride content 5800 parts per million.
We find that the statutes, rules, orders and regulations provide adequate qualitative and quantitative guidelines to *1003 determine which substances and quantities of substances constitute pollutants under the Environmental Quality Act. The Secretary's finding that the salt water and oil were discharged in sufficient quantities to pollute the environment is supported by the record.
Appellant next argues that the term "waters of the state" does not include the drainage ditches into which the salt water and oil were discharged. The oil and salt water were not discharged into waters of the state, thus, there was no violation of the Environmental Quality Act and the rules and regulations promulgated thereunder.
Under La.R.S. 30:1093(5), "waters of the state" consist of both "surface and underground waters within the state of Louisiana including all rivers, streams, lakes, groundwaters, and all other water courses and waters within the confines of the state...." It is almost identically defined in Chapter I, Part IV of Louisiana Water Pollution Control Regulations and Louisiana Water Quality Standards, § III.
`Surface water' means all lakes, bays, rivers, streams, springs, ponds, impounding reservoirs, wetlands, swamps, marshes, water sources, drainage systems and other surface water, natural or artificial, public or private within the State or under its jurisdiction that are not a part of a treatment system allowed by State law, regulation, or permit.
Louisiana Water Pollution Control Regulations, Chapter I Part IV.
Unless specifically excepted by permit, the Louisiana Water Quality Standards apply to intermittent streams which may be dry during dry weather conditions, and to man-made water courses such as ditches or canals created specifically for drainage or water conveyance. Louisiana Water Quality Standards §§ V and VIII. The ditches or depressions in question convey storm water runoff from the lease sites to Gum Gully Canal into the Mermentau River Basin. Pollutants entering the ditches will generally be received by larger bodies of water.
From a reading of the purpose and policy of the Louisiana Water Control Law, Louisiana Water Quality Standards (V) and (VIII), and the statutory and regulatory definitions of "waters of the state" and "surface water", the drainage ditches into which the oil and salt water were discharged constitute "waters of the state" within the meaning of the Environmental Quality Act.
Although Manuel stated in the Facility Inspection Form that the salt water discharge did not affect the waters of the state, he later clarified by DEQ memorandum that the swift flow in the Gum Gully Canal could have washed away all evidence and effects of the salt water discharge. We find the evidence supports the Secretary's determination that the discharges of the DeVilbis and Taylor sites were in violation of Louisiana Water Pollution Control Regulations Chapters 2.I.B and 3.I.D; La. R.S. 30:1095 and 1096(A); and Order of the Stream Control Commission, effective July 1, 1968.
The DeVilbis discharge was also in contravention of Rule 7 of the Order of the Stream Control Commission, amended January 27, 1953. Rule 7 generally prohibits the discharge of oil field brine into any stream, lake or other body of water, or into any ditch or surface drainage leading to any stream, lake or other body of water. The Taylor discharge is in violation of Rule 2 of the Order of the Stream Control Commission, amended January 27, 1953, which prohibits the discharge of oily fluids on the ground, stream, lake or other body of water, or the conveyance of the oily fluids from the site in open ditches.
Having determined that the Taylor and DeVilbis spills were in violation of the above discussed statutes, rules and regulations we now consider whether McGowan violated the notification requirements imposed by La.R.S. 30:1073, 1096(D) and Notification Regulations and Procedures for Unauthorized Discharges, Part III, 9.3.
La.R.S. 30:1073(J) and La.R.S. 30:1096(D) require notification to the appropriate authorities of a violation by any person who discharges, emits or disposes of any substances *1004 in contravention of the Environmental Quality Act, regulations or permit issued thereunder. Any unauthorized discharge in excess of one barrel of crude oil within a twenty-four hour period must be reported to the proper authorities. Notification Regulations and Procedures for Unauthorized Discharges, Part III 9.35. Thus, McGowan was required to report the Taylor oil spill.
Part III 9.3.6 provides that unauthorized discharges which "may reasonably be expected to result in violation of the Louisiana Water Quality Standards and/or significant impairment of designated water uses" must be reported. Appellant contends Part III 9.3.6 is vague and indefinite in that appellant is unable to determine the quantity of salt water discharged which triggers the notification requirement. However, as we noted previously, the Louisiana Water Quality Standards do set specific numerical criteria for the amounts of chloride per liter which triggers enforcement action. Additionally, the Order of the Stream Control Commission, effective July 1, 1968, prohibits the discharge of all oil field wastes into waters of the state. Part III 9.3.6 is neither vague nor indefinite and McGowan was required to notify the appropriate authority of this discharge.

PENALTY
In the second assignment of error, appellant alleges that the Secretary erred in assessing penalties relative to the salt water discharge because DEQ failed to prove damage to the environment resulting from the discharge. A showing of actual damage to the environment is not required for assessment of a penalty under La.R.S. 30:1073(E). Office of Environmental Affairs v. McWhorter and Associates, Inc., 449 So.2d 1062 (La.App. 1st Cir.1984). This assignment of error has no merit.
In the eleventh and seventeenth assignments of error appellant alleges that in assessing the penalty the Secretary erred in finding that appellant received monetary benefits through his non-compliance with the Environmental Quality Act, and its rules and regulations. The Secretary found that the monetary benefits realized by appellant were insignificant. This assignment of error has no merit.
In the ninth assignment of error appellant alleges that the Secretary erred in considering appellant's gross revenues as a factor in assessment of the penalty. La.R.S. 30:1073(E)(3)(a)(iii) provides that the gross revenues generated by the respondent shall be considered in determining whether a penalty should be assessed and the amount of the penalty. The assignment of error is without merit.
In the fifteenth and sixteenth assignments of error appellant alleges that the penalty assessed by the Secretary is arbitrary and capricious, constitutes double jeopardy and is unconstitutional in that the original penalty assessed by the Secretary prior to the hearing was $5,000 and the penalty assessed after the hearing was $56,000.
Marion Fannaly, Enforcement Program Manager of the Water Pollution Control Division stated that the original $5000 penalty assessed by the Secretary was based on the fact that the salt water discharge was a significant one. But for the fact that the ditch emptied into a flowing stream, extensive damage to vegetation would have resulted. The oil spill was considered a minor violation. The average fine for oil field violations in the two previous years was $8700 and varied from $1500 to $20,000 for single incidents. In recommending the original $5,000 penalty to the Secretary, Assistant Secretary Dale Givens stated, among other things, that the environmental damage was transitory in nature; the monetary benefits were insignificant; there was no prior history of violations; and the sites were being cleaned. The factors considered by the Secretary in assessing the original $5,000 penalty were similar to those considered in assessing the $56,000 penalty after the hearing.
An agency decision assessing a penalty should not be set aside unless it is arbitrary, capricious or characterized as an abuse of discretion. La.R.S. 49:964(G)(5); Save Ourselves, Inc. v. Louisiana Environmental *1005 Control Commission, 452 So.2d 1152 (La.1984). After reviewing the record we conclude that the factors constituting the basis for the amount of penalty were considered when the $5000 penalty was assessed. The hearing itself appears to be the only basis for the $51,000 increase in penalty assessment. We find this to be arbitrary, capricious and an abuse of discretion. Having determined the $56,000 penalty to be arbitrary and an abuse of discretion, we need not address the tenth assignment of error.
Accordingly the order of the Secretary assessing a $56,000 penalty is amended to reinstate the original $5000 penalty. In all other respects the matter is affirmed. Costs of this proceeding in the sum of $110 are assessed equally against DEQ and appellant.
AMENDED AND AFFIRMED.
SHORTESS, J., concurs in part and dissents in part. I would affirm the DEQ's penalty assessment on the salt water discharge (DeVilbis site).