CARTER, Judge.
This is an appeal from a judgment rendered by the Secretary of the Louisiana Department of Environmental Quality (DEQ), assessing a penalty for violations of the Environmental Quality Act, Louisiana Water Control Law.

FACTS

AMCO Construction Company (AMCO) owns and operates a ready-mix concrete plant bn Louisiana Highway 30, approximately one-half mile west of Interstate 10, near Gonzales. On two separate occasions, once on November 10, 1981, and again on June 6, 1985, the Department of Environmental Quality (DEQ) issued a Compliance Order to AMCO, for violations of LSA-R.S. 30:1095 (now 30:2075) and 30:1096 (now 30:2076). AMCO did not appeal either compliance order, but allegedly attempted to undertake all necessary corrective action.
On May 22, 1986, a proposed Penalty Notice, assessing a $20,000.00 penalty, was issued to AMCO. The notice was served upon AMCO by certified mail on May 23, 1986. On June 5, 1986, AMCO timely requested a hearing on the proposed penalty. The request was received by DEQ on June 6,1986.[1]
On October 7, 1991, a hearing on the proposed penalty was held before Administrative Law Judge, Vivian Broussard Guillory. On February 24, 1992, she submitted her “Findings of Fact, Conclusions of Law and Recommendations” to the Secretary of the DEQ, recommending that the penalty assessed against AMCO be upheld.
The “Findings of Fact” submitted by the ALJ and adopted by the DEQ Secretary are as follows:
1. Respondent owns and operates a concrete mixing and loading facility located on La. Hwy 30, approximately ⅜ mile West of the 1-10 intersection, near Gonzales in Ascension Parish, Louisiana.
2. On July 15, 1981, as the result of a citizen complaint, Mr. Pete Romanowsky, an inspector for DEQ, performed an inspection of the AMCO facility. He observed multiple discharges consisting of *729 visually evident high suspended particulates exiting the facility at multiple locations. At the points where the discharges entered the adjoining drainage ditches the material had solidified. The Respondent was informed that these discharges must be permitted.
3. On October . 23, 1981, another inspection was conducted by Mr. Romanowsky. He observed evidence of wastewater discharges with high solid content. Additionally, he observed standing diesel fuel in adjacent ditches to an undiked diesel storage tank. The Respondent was advised that the diesel storage tank must be diked and that the diesel contamination must be cleaned up.
4. On October 30,1981, Mr. Romanowsky performed a follow up inspection and observed no evidence of remediation since his prior inspection.
5. Mr. Romanowsky inspected the facility again on November 5, 1981, and observed that although the diesel tank had been surrounded by a containment levee, the clean up of the diesel fuel had not been accomplished and the fuel had migrated further down the adjacent ditch.
6. On November 10, 1981, the Department of Environmental Quality issued Compliance Order No. 81054 to the Respondent for the unpermitted discharge of contaminated wastewater. ... [a violation of LSA-R.S. 30:1095].[2]
[[Image here]]
7. Compliance Order No. 81054 was not appealed by the Respondent.
8. On May 20, 1982, Mr. Romanowsky inspected the facility along with two other DEQ officials and found that the diesel contamination had been removed and observed the operation of the settling basin that had been constructed by the Respondent. Although he witnessed no discharges exiting the facility, he observed several areas where discharges were bypassing the settling pond. He specifically observed that the ditches were fairly well blocked with particulate which he considered to be evidence of previous discharges which had occurred.
A sample of wastewater runoff was taken at a low point on the facility, near the south ditch, and testing revealed the TSS level [Total Suspended Solid] was greater than two orders of magnitude above the 50 mg/1 required by Compliance Order No. 81054.
9. On July 27,1982, Mr. David Brightbill, an inspector with the Department, conducted an inspection of the facility. He observed that the adjacent ditches had been cleared of accumulated solids and noted that the settling basin and levees were functioning properly.
10. On August 6, 1982, Mr. Romanowsky inspected the facility and found evidence of remediation attempts by the Respondent. He observed that the Respondent was utilizing a settling basin in an attempt to contain the discharge from the facility. In spite of this, he observed areas where the wastewater had short circuited or bypassed the settling basin and was discharging at two point-sources.
11. On August 30, 1982[,] an application for a Louisiana Water Discharge Permit was received by the Department from Respondent.
12. On January 25, 1983, Mr. Romanow-sky inspected the facility to evaluate the adequacy of the permit application. He observed that the Respondent had taken additional steps to control and contain the discharges through the settling system. Despite these measures, he again observed discharges occurring at two points.
13. On July 15, 1983, a proposed Louisiana Water Discharge Permit (WP509) was issued. To date this permit has not been finalized. On February 5, 1986, the De *730 partment adjusted Respondent’s account to reflect to [sic] a zero balance and the reason indicated was that “[t]hey had stopped all discharges.”
14. On August 24, 1984, Mr. Charles Melchior, an inspector with the Department, performed an inspection of the facility. He observed and tested a discharge from the south side of the washout pond. The discharge had a pH of 11.5 standard units when the water criteria for the receiving basin was 6.0 to 9.0 standard units. The water conductivity was 7000 micro-moles per square centimeter. He noted two 500 gallon storage drums, which separately held hydraulic oil and motor oil, were not secured by levee. Additionally, he observed oil spillage on the ground around a 9000 gallon diesel tank, and another 9000 gallon diesel tank with oily water inside eroded levees. The Respondent repaired the pond levee where the discharge was occurring before Mr. Melchior left the facility.
15. On June 6, 1985, the Respondent was issued Compliance Order No. 85082. Said Order was served on the Respondent on June 7, 1985....[3]
[[Image here]]
16. Compliance Order No. 85082 was not appealed by the Respondent.
17. On March 3,1986, Mr. Melchior again inspected the facility. He witnessed an opening in the levee on the southside of the washout pond, and a low spot near the north side. During the inspection he observed evidence that discharges had occurred. Mr. Melchior tested the pond pH level to be 11.9 standard units and the pH of the back ditch to be 7.5 standard units.
18. Mr. Charles Melchior inspected the facility again on March 5, 1986. He noted that the levee system had been repaired. He also noted that there was no fire wall around the hydraulic oil/motor oil tanks or the concrete add/mix tanks.
19. On May 22, 1986, the Department issued a Proposed Penalty Notice (WP-86-058). The Penalty Notice was served by certified mail on the Respondent on May 27, 1986.
20. The Respondent timely filed a request for a hearing with the Department on the Penalty Notice on June 5, 1986.
21. On August 6, 1986, the Department performed their last inspection of the facility. At that time, Mr. Charles Melchior observed no discharges leaving the facility. Additionally, the levees on the facility had been built up.
22. The request for hearing was received by the Administrative Hearings Division on December 12, 1990, at which time an initial status conference on the Penalty Order was scheduled for February 13, 1991. The Respondent was notified by certified mail on December 17, 1990. (Footnote omitted).
The ALJ also submitted the following “Conclusions of Law,” which were adopted by the DEQ Secretary:
1. Compliance Order No. 81054, issued to Respondent on November 10, 1981, was never appealed and therefore, the findings are final as a matter of law.
2. LSA R.S. 30:2075 (formerly Section 1095) prohibits any activity which results in the discharge of any substance into the waters of the state without an appropriate permit.
3. “Waters of the state” means both the surface and underground waters within the state of Louisiana including all rivers, streams, lakes, groundwaters, and all other water courses and waters within the confines of the state, and all bordering waters and the Gulf of Mexico. LSA R.S. ... 30:2073(5).
4. Respondent violated Compliance Order No. 81054 issued on November 10,1981, by *731 its failure to submit within 30 days of receipt of said Order a completed application for a discharge permit to the Department. The application was received on August 30, 1982.
5. The Respondent violated Compliance Order No. 81054 and LSA R.S. 30:2076 A.(3) by failing to finalize the required permit to discharge wastewater.
6. Respondent did cause or allow the un-permitted discharge of wastewater on August 6,1982, January 25, 1983, and August 24, 1984, in violation of Compliance Order No. 81054 thereby violating LSA R.S. 30:2076 A.(l)(a) (formerly Section 1096), LSA R.S. 30:2076 A.(3), and LSA R.S. 30:2075.
7. The Respondent maintained that they intended to contain the wastewater on the facility, obviating the need for the discharge permit ordered in the first compliance order. However, the evidence demonstrates that following that order and prior to the submission of an application for a permit or the granting of a draft permit, the Respondent did allow discharges from the facility which resulted in blockages to the local ditch drainage system in violation of Compliance Order No. 81054.
8. Respondent further violated Compliance Order No. 81054, issued on November 10, 1981, by failing to route all drainage from the facility through a settling basin of adequate design and capacity to reduce the total suspended solids content of the discharge below a level of 50 mg/1 within thirty (30) days of receipt of the Order. Testing determined the sample taken of the wastewater discharge during the August 24, 1984 inspection consisted of 163 mg/1 total suspended solids, in excess of the 50 mg/1 limit set in the November 10, 1981, Compliance Order. This excess violates Compliance Order No. 81054 and therefore, LSA R.S. 30:2076 A.(3).
9. Compliance Order No. 85082, issued to Respondent on June 6, 1985, was never appealed and therefore, the findings are final as a matter of law.
10. The March 5, 1986, inspection revealed the lack of a fire wall around the hydraulic oil/motor oil tanks. This was a violation of the June 6, 1985, Compliance Order (No. 85082) which specifically ordered the Respondent to construct levees around fuel and or chemical holding tanks.
11. The Respondent, by failing to finalize the required permit to discharge wastewa-ter, additionally violated the June 6, 1985, Compliance Order (No. 85082) as well as LSA R.S. 30:2076 A(3).
12. Respondent has been recalcitrant and failed to comply with state regulations and laws despite repeated notifications of non-eompliant discharges.
13. Respondent has not been prejudiced in the untimely prosecution of this matter. (Footnotes omitted).
After reaching the above conclusions, the ALJ considered the penalty in light of the factors set forth in LSA-R.S. 30:2025 E(3)(a) and submitted to the Secretary the following responses to each of the criteria set forth therein:
(I) The history of previous violations or repeated noncompliance.
Response:
The evidence in the record demonstrates two previous compliance orders issued by the Department in addition to numerous instances of noncompliance. The Department inspected the facility on eleven occasions prior to the imposition of the penalty. On ten of these inspections, violations of the water quality regulations were occurring. The Respondent was repeatedly informed of their need for a permit. While the Respondent desired to conduct its business in a manner which would not lead to the requirement of having to obtain a permit, it did not prevent the unpermitted discharges. For the most part the Respondent continually violated the same regulations and statutes over the six year period in question.
(II) The nature and gravity of the violation.
Response:
The nature of the violations are the unauthorized and unpermitted discharge of wastewater to the waters of the state. The gravity of the violations is minor.
*732 (III) Gross revenue.
Response:
No evidence concerning the gross revenue of the Respondent was submitted.
(IV) The degree of culpability, recalcitrance, defiance or indifference to regulations or orders.
Response:
There has been no contradictory evidence concerning the culpability of the Respondent. The Respondent is the party responsible for the discharges. Even though Respondent asserts that the diesel fuel spill was the result of vandalism, this does not release the Respondent from the responsibility to notify the Department and to timely clean up the spill.
The recalcitrance, defiance, or indifference to the regulations of the Department is evidenced by the failure of the Respondent to come into compliance with the regulations of the Department despite numerous notifications over several years that the facility was not in compliance with those regulations. While the Respondent repeatedly expressed their intentions to prevent contaminated water from leaving the premises, thereby preventing unpermitted discharges and obviating their need for a permit, they failed to monitor and conduct adequate maintenance practices to meet these standards.
For example, Mr. Raymond E. Heck, president of AMCO Construction, stated for the record that he does not know the condition of his facility, has not been to the facility in several years and further does not know whether discharges are still occurring today. These facts lend a disturbing lack of confidence to the Respondent’s claim that the facility would be maintained in a manner that would prevent unpermitted discharges. This attitude suggests that unless the Department continues to perform regular inspections and continually inform the Respondent of the actions required of him by the law, the Respondent is content to continue with his business indifferent and/or defiant of Department of Environmental Quality regulations or orders.
(V) Monetary benefits realized through noncompliance.
Response:
The Department cited the failure of the Respondent to finalize a proposed water discharge permit and pay the associated costs as the monetary benefits realized through non-compliance. The evidence in the record indicates the Department released the Respondent from this liability in February of 1986, however, until the Department zeroed out the permit fees, Respondent was liable for said cost, especially in light of clear evidence that the facility at issue was discharging with out [sic] a permit.
The Respondent has realized benefits through non-compliance in the form of delayed costs for the maintenance of an adequate water discharge system. The evidence indicates that the Respondent failed to maintain the efforts it began to control the discharge problem. These delayed costs are monetary benefits realized through non-compliance.
(VI) Degree of risk to human health or property caused by the violations.
Response:
The risk to human health or property from the violations was minimal and transitory.
(VII) Whether the noncompliance and surrounding circumstances were immediately reported to the Department and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.
Response:
There was no attempt to conceal the violations, nor were the violations reported to the Department.
(VIII) Whether the person charged has failed to mitigate or make a reasonable attempt to mitigate the damages caused by his noncompliance or violation.
*733 Response:
The Respondent made attempts at remediation of the ditches following the diesel spill from the above ground tank. The Respondent flushed the ditches and used absorbent pads to clean out the ditches. These activities cost the Respondent approximately $5,000.00.
The Respondent attempted to mitigate the damage from the solids in the ditches by clearing the build up from the ditches. The evidence indicates the Respondent cleared the ditches only once in 1981 although the discharges continually occurred until 1986.
The Respondent also built a slab with a curb along the north side of the property which would channel any discharge into a settling pond. This work was intended to prevent the discharge of wastewater into the ditch at this end of the property. Although this work was completed, it did not completely eliminate the discharge of wastewater from the premises.
(IX) The costs of bringing and prosecuting an enforcement action, including staff time, equipment use, hearing records, expert assistance.
Response:
No evidence was submitted on the cost of bringing this enforcement action.
The cost of obtaining a transcript of the hearing was $537.00.
After considering the factors set forth above, the ALJ ultimately recommended that the civil penalty of $20,000.00 be upheld. On April 26,1992, the final judgment was signed by the Secretary of the DEQ, adopting the findings of fact, conclusions of law, and recommendations submitted by. the ALJ. AMCO was then ordered to pay the $20,-000.00 penalty within twenty days after receipt of the decision. The Secretary of the DEQ further ordered that failure to pay the penalty timely would result in referral to the Attorney General for enforcement.
From this adverse judgment, AMCO appeals, assigning the following specifications of error:
A.The evidence submitted by DEQ was insufficient to support a $20,000 penalty in that numerous findings of fact by the ALJ were not supported by the record.
B. The Secretary of DEQ was arbitrary and capricious and manifestly erroneous in assessing a $20,000 penalty against AMCO by not applying and considering all of the criteria set forth in LSA-R.S. 30:2025E(3)(A).
C. The Secretary of DEQ was arbitrary and capricious in applying the law to the facts and manifestly erroneous in his findings of fact.

FINDINGS OF FACT and APPLICATION OF LAW TO FACTS

AMCO contends that the DEQ Secretary was manifestly erroneous in his findings of fact and was arbitrary and capricious in applying the law to the facts.
It is well settled that the manifest error standard is used in reviewing the facts as found by an agency. Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984); In the Matter of Sixty Acres, Inc., 546 So.2d 575, 578 (La.App. 1st Cir.1989). However, the arbitrariness test is used in reviewing conclusions and exercises of agency discretion. Bizette v. State, Department of Public Safety, 583 So.2d 875, 877 (La.App. 1st Cir.1991); Amoco Production Company v. Thompson, 566 So.2d 138, 145 (La.App. 1st Cir.), writs denied, 571 So.2d 627, 628 (La.1990).
After thoroughly reviewing the entire record, we conclude that there is ample evidence in the record to support the findings of fact submitted by the ALJ and adopted by the DEQ Secretary. Therefore, we cannot say that the factual findings are manifestly erroneous. We also conclude that the Secretary was not arbitrary and capricious in applying the law to the- facts.

ASSESSMENT OF THE PENALTY.

AMCO further contends that the evidence submitted by DEQ was insufficient to support the penalty imposed. AMCO also contends that the Secretary erred in assessing the penalty against them because all of the factors in LSA-R.S. 30:2025 E(3)(a) were not considered.
*734 LSA-R.S. 30:2072 of the Louisiana Environmental Quality Act, Louisiana Water Control Law[4] provides as follows:
The legislature finds and declares that the waters of the state of Louisiana are among the state’s most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this state. To insure the proper protection and maintenance of the state’s waters, it is necessary, to adopt a system to control and regulate the discharge of waste materials, pollutants, and other substances into the waters of the state.
Therefore, any activity resulting in the discharge of any substance into the waters of the state without a required license or permit is prohibited by LSA-R.S. 30:2075. Specific prohibitions are set forth in LSA-R.S. 30:2076, which provides, in pertinent part, as follows:
A. (1) No person shall discharge or allow to be discharged into any waters of the state:
(a) Any waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation; or
(b) Any substance, the discharge of which violates any term, condition, or limit imposed by a permit.
(2) The provisions of this Chapter shall not apply to any unintentional nonpoint-souree discharge resulting from or in connection with the production of raw agricultural, horticultural, or aquacultural products.
(3) No person shall violate any rule or regulation adopted under this Chapter or the terms of any permit or order issued under authority of this Subtitle.
Upon determining that a violation has occurred or is about to occur, the commission, secretary, assistant secretary, or the authorized representative of the assistant secretary shall either issue an order requiring compliance within a specified time period, or the commission or the secretary shall commence a civil action for appropriate relief. LSA-R.S. 30:2025 C(3). A compliance order shall state with reasonable specificity the nature of the violation, a time limit for compliance, and that, in the event of noncompliance, a civil penalty may be assessed. LSA-R.S. 30:2025 D.
Any person to whom a compliance order is issued pursuant to LSA-R.S. 30:2025 C who fails to take corrective action within the time specified in the order shall be liable for a civil penalty of not more than fifty thousand dollars for each day of continued violation or noncompliance. LSA-R.S. 30:2025 E(2). In determining whether or not a civil penalty is to be assessed and in determining the amount of the penalty, LSA-R.S. 30:2025 E(3)(a) states that the following factors shall be considered:
(i) The history of the previous violations or repeated noncompliance.
(ii) The nature and gravity of the violation.
(iii) The gross revenues generated by the respondent.
(iv) The degree of culpability, recalcitrance, defiance, or indifference to regulations or orders.
(v) The monetary benefits realized through noncompliance.
(vi) The degree of risk to human health or property caused by the violation.
(vii) Whether the noncompliance or violation and the surrounding circumstances were immediately reported to the department and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.
(viii) Whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his noncompliance or violation.
(ix) The costs of bringing and prosecuting an enforcement action, including staff time, equipment use, hearing records, expert assistance, and such other *735 items as the commission finds to be a cost of the action.
When the word “shall” is used in the Revised Statutes, it is mandatory. LSA-R.S. 1:3; Testa Distributing Company, Inc. v. Tarver, 584 So.2d 300, 310 (La.App. 1st Cir.1991); State, Department of Revenue and Taxation v. Succession of Pope, 579 So.2d 1152, 1154 (La.App. 2nd Cir.), writ denied, 585 So.2d 566 (La.1991); Erich Sternberg Realty Company, Inc. v. Louisiana Tax Commission, 560 So.2d 868, 879 n. 9 (La.App. 1st Cir.) writ denied, 567 So.2d 107 (La.1990). Therefore, under the clear wording of the statute and in accordance with the rules of statutory construction, LSA-R.S. 30:2025 E(3)(a) sets forth nine factors which must be considered in determining whether or not a civil penalty is to be assessed and in determining the amount of the penalty.
In the instant case, the record reveals that the DEQ failed to consider two of the statutorily mandated criteria in assessing the penalty against AMCO. Timothy Brewster, who is employed by the DEQ, Office of Water Resources, testified that the DEQ did not consider AMCO’s gross income in assessing the penalty. The record also reveals that the DEQ also failed to consider the cost of bringing the enforcement proceedings.
Generally, an agency decision, assessing a penalty should not be set aside unless it is arbitrary, capricious, or characterized as an abuse of discretion. LSA-R.S. 49:964 G(5); Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d at 1159; In the Matter of McGowan, 533 So.2d 999, 1004 (La.App. 1st Cir.1988), writ denied, 537 So.2d 1168 (La.1989), cert. denied, 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989). Because we find that DEQ failed to consider two of the mandatory criteria in assessing a large fine for a minor violation, we must vacate the penalty imposed and remand the matter for a reconsideration of the penalty after appropriate consideration of all of the factors set forth in LSA-R.S. 30:2025 E(3)(a).[5]

CONCLUSION

For the reasons set forth above, the penalty imposed by the DEQ is vacated, and the matter is remanded for a reconsideration of the penalty after consideration of all of the mandated factors set forth in LSA-R.S. 30:2025 E(3)(a). In all other respects, the judgment of the DEQ is affirmed. Costs of this appeal are to be assessed against DEQ in the amount of $244.51.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. On June 6, 1991, AMCO filed a motion to dismiss the penalty notice for the DEQ's failure to prosecute the action within five years of AMCO's request for hearing. On June 27, 1991, AMCO filed a supplemental motion to dismiss, withdrawing the previous abandonment claim, and basing the motion on the doctrine of laches. The motion to dismiss was denied on August 1, 1991.

. AMCO was ordered to remove the contamination and solid material from the adjacent ditches, to route all drainage from the facility through a settling basin to reduce the total suspended solids content of the discharge below a level of 50 mg/1. AMCO was further ordered to complete an application for a Louisiana Water Discharge Permit and submit it to the Water Pollution Control Division, Office of Environmental Affairs, and to submit a full written report order detailing the actions taken to comply with the order within 30 days of receipt of the compliance order.

. The order required AMCO to immediately comply with all terms and conditions of the proposed Louisiana Wastewater Discharge Permit and to take all actions necessary for final issuance of the permit within thirty days (payment of the initial fee of $600.00, $1,100.00 in late charges, $500.00 for current charges, and repair or construction of levees around fuel and/or chemical holding tanks). AMCO was also required to submit a full written report to the Water Pollution Control Division, detailing the actions taken to achieve compliance with the order and the reasons for delay in completing actions necessary for final permit issuance.

. Part IV of Chapter 11 of Title 30 of the Revised Statutes of 1950 containing R.S. 30:1091 to 30:1098 was redesignated as Chapter 4 of Subti-tie II of Title 30, containing R.S. 30:2071 to 30:2078.

. We note that the ALJ found and the Secretary of the DEQ adopted the finding that "the gravity of the violation is minor” and yet assessed a large and substantial civil penalty. LSA-R.S. 30:2025 E(3)(a)(ii) requires that the nature and gravity of the violation be considered in determining whether a civil penalty is imposed and the amount thereof.